IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

DAVID GLYNN and JEANNE GLYNN, )
)
    Plaintiffs )
) COMPLAINT AND DEMAND
vs. ) FOR JURY TRIAL
)
BIOMET, INC., and )
BIOMET ORTHOPEDICS LLC, )
)
    Defendants. )

## NATURE OF THE CASE

1. This is an action for product liability on behalf of Plaintiff, David Glynn against Defendants who were responsible for the defective hip system implanted in Plaintiff which has caused him pain, the inability to engage in normal daily activity, and a painful revision surgery.

## PARTIES

2. Plaintiff, David Glynn, is a citizen of the United States of America, citizen of the Commonwealth of Massachusetts at the time of implant and at all relevant times, and resides in the city of East Falmouth.

3. Plaintiff, Jeanne Glynn, is a citizen of the United States of America, citizen of the Commonwealth of Massachusetts at the time of implant and at all relevant times, and resides in the city of East Falmouth.

4. At all relevant times to this Complaint, Plaintiffs David Glynn and Jeanne Glynn were and are husband and wife.

5. On information and belief, Defendant Biomet Orthopedics, LLC is a limited liability company organized and existing under the laws of the state of Indiana with its primary place of business in Warsaw, Indiana. Pursuant to the LLC Agreement dated February 29, 2008,

Biomet, Inc., which is a citizen of Indiana, is the sole member of Biomet Orthopedics, LLC. Additionally, pursuant to the Business Entity Report filed with the Indiana Secretary of State on April 10, 2013, all current principals of Biomet Orthopedics, LLC are located in Warsaw, Indiana. Therefore, Biomet Orthopedics, LLC is a citizen of Indiana. Biomet Orthopedics, LLC designed, manufactured, marketed, promoted, and sold the M2a Magnum™ Hip System that is the subject of this lawsuit. Biomet, Orthopedics, LLC marketed, promoted, and sold the Device in Massachusetts.

6. On information and belief, Defendant Biomet, Inc. is a corporation organized and existing under the laws of the state of Indiana with its primary place of business in Warsaw, Indiana. Biomet, Inc. designed, manufactured, marketed, promoted, and sold the M2a Magnum™ Hip System that is the subject of this lawsuit. Therefore, Biomet, Inc. is a citizen of Indiana. Biomet, inc. marketed, promoted, and sold the Device in Massachusetts.

7. At all times mentioned, each of Biomet, Inc., and Biomet Orthopedics, LLC, was the representative, agent, employee, joint venturer, or alter ego of each of the other entities and in doing the things alleged herein was acting within the scope of its authority as such. Specifically, each Defendant was but an instrumentality or conduit of the other in the prosecution of a single venture, namely the design, promotion, and sale of the M2a Magnum™ Hip System. Therefore, it would be inequitable for any Defendant to escape liability for an obligation incurred as much for that Defendant's benefit as for the other.

8. Biomet, Inc., and Biomet Orthopedics, LLC, are collectively referred to herein as "Biomet."

9. Upon information and belief, at all relevant times, Defendants, committed tortious acts within the Commonwealth of Massachusetts, out of which these causes of action arise.

2

## SUBJECT MATTER JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because complete diversity exists between Plaintiff and Defendants.

11. Venue for this action lies in the United States District Court of Massachusetts, because the Plaintiff resides in this District and the wrongful acts upon which this lawsuit is based occurred, in part, in this District. Venue is also proper pursuant to 28 U.S.C. §1391(c) because Defendants have substantial, systematic, and continuous contacts in the District of Massachusetts, and they are all subject to personal jurisdiction in this District.

12. Plaintiff states that, but for the order permitting direct filing into the Northern District of Indiana pursuant to CMO No. 1 dated February 15, 2013, plaintiff would have filed in the United States District Court of Massachusetts. Therefore, Plaintiff respectfully requests that at the time of transfer of this action back to the trial court for further proceedings, that this case be transferred to the U.S. District Court of Massachusetts.

## FACTUAL BACKGROUND

**A. The M2a Magnum ™ Hip System Is Defective And Was Not Adequately Tested**

13. The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the very top of the femur) rotating within the acetabulum (a cup-like structure at the bottom of the pelvis.) In a healthy hip, both the femur and the acetabulum are strong and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids.

14. A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal and plastic. A typical total hip replacement system consists of four

separate components: (1) a femoral stem, (2) a femoral head, (3) a plastic (polyethylene) liner, and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The femoral head is a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint when it is placed inside the polyethylene liner and acetabular shell.

15.     While most hip replacements use a polyethylene plastic acetabular liner, Biomet's M2a Magnum™ Hip System has a critical difference: it is a monoblock system which does not have an acetabular liner, Instead, the M2a Magnum ™ Hip System forces metal to rub against metal with the full weight and pressure of the human body. Because of Biomet's defective design for the M2a Magnum ™ Hip System, hundreds of patients-including Plaintiff- have been forced to undergo surgeries to replace the failed hip implants.

16.     The M2a Magnum™ Hip System suffers from a design or manufacturing defect that cause excessive amounts of cobalt and chromium to wear and corrode from the surface of the acetabular cup, from the femoral head, and from the taper adapter. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant. This rejection often manifests with symptoms of pain, looseness, dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often causes fluids to accumulate and soft tissues and bone to die.

17.     The design of the M2a Magnum™ Hip System was not sufficiently tested by Biomet.

18.     On numerous occasions, Biomet met with orthopedic surgeons throughout the United States, and other cities to promote the M2a Magnum ™ Hip System. At some or all of these meetings, a representative or representatives of Biomet was present. During these meeting,

4

Biomet assured the orthopedic surgeons, that the M2a Magnum ™ Hip System was safe, was the best product on the market, had an excellent track record and a low and acceptable failure rate. Biomet continued to defend and promote the M2a Magnum ™ Hip System even after they became aware of numerous and serious complications with the M2a Magnum ™ Hip System. Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other harmful data during their meetings with orthopedic surgeons.

**B.     Biomet Sold the M2a Magnum DI Hip Implant To Plaintiff After It Knew It Was Defective, That It Had Injured Others, And That It Would Injure Plaintiff**

19.     It wasn't long after Biomet launched the M2a Magnum™ Hip System that reports of failures began flooding into Biomet. For example, in August 2004, Biomet received a complaint that a patient had to undergo a surgery to remove and replace an M2a Magnum ™ Hip System because it had become loose after only 3 years. Biomet closed its investigation of this Complaint.

20.     Biomet would go on to receive hundreds of similar complaints reporting that the M2a Magnum ™ Hip System had failed and that the failure had forced patients to undergo painful and risky surgeries to remove and replace the failed hip component. To date hundreds of reports of adverse events associated with the M2a Magnum™ Hip System have been filed with the FDA.

21.     By the time Biomet sold the M2a Magnum™ Hip System to Plaintiff in 2011, hundreds of reports had been filed with the FDA reporting an adverse event associated with the M2a Magnum™ Hip System. Consequently, Biomet was fully aware that the M2a Magnum™ Hip System was defective and that hundreds of patients already had been injured by that defect. Based on this information, Biomet should have recalled the M2a Magnum ™ Hip System before

it was sold to Plaintiff. At minimum, Biomet should have stopped selling the defective implant when it became aware that it had catastrophically failed in a large number of patients.

22. Despite its knowledge that the M2a Magnum ™ Hip System had a defect and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, Biomet continued to sell the defective M2a Magnum ™ Hip System. In so doing, Biomet actively concealed the known defect from doctors and patients-including Plaintiff -and misrepresented that the M2a Magnum™ Hip System was a safe and effective medical device.

23. As numerous failures of the M2a Magnum™ Hip Implant were reported to Biomet, it continued to actively promote, market and defend the defective products. For example, Biomet published marketing brochures touting the safety and durability of metal-on-metal implants and specifically, the M2a Magnum™ Hip System. These brochures were given to doctors around the world to encourage them to use the M2a Magnum™ Hip System.

24. Despite its knowledge that the M2a Magnum™ Hip System was defective, Biomet also made several false representations about specific design elements of the M2a Magnum™ Hip System that they claimed made it superior to other more safe hip implants on the market. For example, Biomet said:

- "The M2a-Magnum™ Large Metal Articulation System offers optimal joint mechanic restoration and ultra low-wear rates in vivo."
- "Many studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants."

25. Biomet's reason to conceal the defect in its M2a Magnum™ Hip System is clear. Hip implant sales were critically important to Biomet, and the M2a Magnum™ was one of its

most profitable products. Biomet's management needed to make Biomet look appealing to investors, and they ultimately were purchased by a private equity firm in 2007 for $10 billion. Biomet was faced with a critical defect in one of its most profitable hip implant systems. The last thing Biomet wanted to do was to admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery. Focused on corporate profits, and at the expense of patient safety, Biomet decided that it would continue to promote, market, and sell the M2a Magnum ™ Hip System despite the fact that it knew the product was defective. Biomet continued to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that were reported to the company.

### C. Plaintiff's M2a Magnum™ Hip System is Defective And is Failing, Forcing Plaintiff Physical Pain and Was Unable to Engage in Normal Daily Activity

26. On or about November 2, 2011, Mr. Glynn underwent a surgical procedure to implant the M2a Magnum Hip System in his left hip at Falmouth Hospital in Falmouth, Massachusetts by Dr. Paul Dimond. By this time, Biomet knew that the product was defective. But Biomet refused to disclose that information to Mr. Glynn, his physicians, or the public. Instead, Biomet misrepresented to Mr. Glynn and his orthopedic surgeon that the M2a Magnum™ Hip System was safe and effective. In reliance on these representations, Mr. Glynn's orthopedic surgeon made the decision to use the M2a Magnum™ Hip System.

27. As a result of the defective design, manufacture and composition of the M2a Magnum™ Hip System, and its accompanying warnings and instructions (or lack thereof), Mr. Glynn's hip implant failed, causing him constant and severe pain and the need for revision surgery.

7

28. On or about February 2, 2015, Mr. Glynn underwent a complex, risky, and painful surgery (known as a "revision surgery") to remove the failed M2a Magnum ™ Hip System from Plaintiff's body. Revision surgeries are generally more complex than the original hip replacement surgery, often because there is a reduced amount of bone in which to place the new hip implants. Revision surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a higher rate of complications.

29. Having to go through a revision surgery subjected Mr. Glynn to much greater risks of future complications than he had before the revision surgery. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent an original hip replacement surgery. In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, et al. Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement. American Journal of Bone and Joint Surgery 2003; 85:20-26.)

30. As a direct and proximate result of the failure of his defective M2a Magnum ™ Hip Systems and Biomet's wrongful conduct, Mr. Glynn sustained and continues to suffer economic damages, severe and possibly permanent injuries, pain, suffering and emotional distress. As a result, Mr. Glynn has sustained and will continue to sustain damages in an amount to be proven at trial.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

31. The running of any statute of limitation has been tolled by reason of Defendants' conduct. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's physicians the true risks associated with the M2a Magnum Hip System.

32. As a result of Defendants actions, Mr. Glynn and his physicians were unaware, and could not reasonably know or have learned through reasonable diligence that Mr. Glynn had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the Defendants acts and omissions.

33. Furthermore, Defendants are stopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the M2a Magnum™ Hip Implant System. Defendants were under duty to disclose the true character, quality and nature of the M2a Magnum™ Hip Implant System because this was non-public information which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Plaintiff, her medical providers and/or to her health facilities.

34. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose marketing and promoting a profitable medical device. Notwithstanding the known or reasonably known risks. Mr. Glynn and medical professionals could not have afforded and could not have possible conducted studies to determine the nature, extent and identity of health related risks, and were forced to rely on the Defendants' representations.

## FIRST CAUSE OF ACTION AS AGAINST DEFENDANTS
## NEGLIGENCE

9

**(Against All Defendants)**

35. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

36. Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the M2a Magnum™ Hip System into the stream of commerce, including a duty to assure that its product did not pose a significantly increased risk of bodily harm and adverse events and/or a duty to comply with federal requirements.

37. Defendants failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control labeling, marketing, promotions and distribution of the M2a Magnum ™ Hip System into interstate commerce in that Defendants knew or should have known that the product caused significant bodily harm and was not safe for use by consumers, and/or through failure to comply with federal requirements.

38. Despite the fact that Defendants knew or should have known that the M2a Magnum™ Hip System posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the M2a Magnum™ Hip System for use by consumers and/or continued to fail to comply with federal requirements.

39. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

40. As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SECOND CAUSE OF ACTION AS AGAINST DEFENDANTS
### BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

41. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

42. Defendants expressly warranted that the M2a Magnum™ Hip System was a safe and effective orthopedic device for those patients requiring a hip replacement.

43. The M2a Magnum™ Hip System manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to the Plaintiff when used as recommended and directed.

44. As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION AS AGAINST DEFENDANTS
### BREACH OF IMPLIED WARRANTY
### (Against All Defendants)

45. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

46. At the time Defendants designed, manufactured, marketed, sold, and distributed the M2a Magnum™ Hip System for use by the Plaintiff, Defendants knew of the use for which the M2a Magnum™ Hip System was intended and impliedly warranted the product to be of merchantable quality and safe for such use and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

47. The Plaintiff and/or her physicians reasonably relied upon the skill and judgment of Defendants as to whether the M2a Magnum™ Hip System was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters, including that it was in compliance with all federal requirements.

48. Contrary to such implied warranty, Biomet's M2a Magnum™ Hip System was not of merchantable quality or safe for its intended use, because the product was defective as described above, and/or it failed to comply with federal requirements.

49. Defendant breached their implied warranty to Plaintiff in that the M2a Magnum™ Hip System was not of merchantable quality, or safe for its intended use, in violation of MGL ch. 106 §2-314 *et seq.*, because the M2a Magnum™ Hip System was unreasonably dangerous as described above.

50. As a direct and proximate result of Defendants' breach of warranty, the Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

**(Against All Defendants)**

51. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

52. In the exercise of reasonable care, Defendants should have known that its M2a Magnum™ Hip System failed to comply with federal requirements for safe design and manufacture and/or was in other ways out of specification, yet Defendants negligently misrepresented the Plaintiff and/or her physicians that its device was safe and met all applicable design and manufacturing requirements.

53. The Plaintiff and/or hIS physicians reasonably relied to their detriment upon Defendants' misrepresentations and omissions in its labeling, advertisements, and promotions concerning the serious risks posed by these products. The Plaintiff and/or her physicians reasonably relied upon Defendants' representations that the M2a Magnum™ Hip System was safe for use.

54. As a direct and proximate result of Defendants' negligent misrepresentations and omissions and/or its failure to disclose its violations of federal requirements applicable to its M2a Magnum ™ Hip System, Plaintiff used Defendants' M2a Magnum™ Hip System and Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

55. Defendants' actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

56. Plaintiff seeks actual damages from Defendants as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## FRAUD AND INTENTIONAL MISREPRESENTATION
### (Against All Defendants)

57. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

58. Defendants falsely and fraudulently represented to the medical and healthcare community and to the Plaintiff, and/or the FDA, and the public in general, that the subject product had been tested and was found to be safe and/or effective for hip arthroplasty treatment.

59. The representations made by the Defendants were, in fact, false.

60. When said representations were made by the Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

61. Defendants knowingly and intentionally made false representations of material fact to Plaintiff, including but not limited to claims that the M2a Magnum™ Hip System was a safe and durable hip replacement system. They further asserted that the "Biomet metal-on-metal (MoM) M2a Magnum™ Large Metal articulation system offers optimal joint mechanic restoration and ultra low-wear rates in vivo. Many studies conducted over the last several years have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants."

62. These representations were made by the Defendants with the intent of defrauding and deceiving the Plaintiff, the public in general, and the medical and healthcare community in

particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase the subject product for hip arthroplasty treatment, all of which evinced a callous, reckless, willful depraved indifference to the health, safety and welfare of the Plaintiff and the public in general.

63. At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff was treated with the M2a Magnum™ Hip System, the Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

64. In reliance upon said representations, Plaintiff was induced to, and did use the subject product, thereby sustaining severe and permanent personal injuries including but not limited to significant pain, irritation and discomfort, as well as other severe and permanent health consequences, notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects over other hip arthroplasty devices.

65. Defendants knew and were aware or should have been aware that the M2a Magnum™ Hip System had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

66. Defendants knew or should have known that the M2a Magnum™ Hip System had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

67. Defendants brought the subject product to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiff.

68. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions and/or its failure to disclose its violations of federal requirements applicable to its M2a

Magnum™ Hip System, the Plaintiff used Defendants' M2a Magnum™ Hip System and the Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages.

69.     Plaintiff seeks actual damages from Defendants as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT
### M.G.L. c. 93A
### (Against All Defendants)

70.     Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

71.     At all relevant times hereto the Defendants were engaged in trade or commerce.

72.     The acts of the defendants alleged in Counts I through V constitute unfair or deceptive acts or practices within the meaning of G.L. c. 93A, §§ 2 and 3, 940 C.M.R. 3.05(1), and 940 C.M.R. 3.16(1) and (2).

73.     The actions of the Defendants described herein were performed willfully and knowingly.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION AS AGAINST DEFENDANTS
### LOSS OF CONSORTIUM
### (Against All Defendants)

74. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

75. Plaintiff, Jeanne Glynn, as a result of the injuries sustained by her husband, Plaintiff, David Glynn, described above, has suffered loss of consortium.

76. She has suffered, and will continue to suffer in the future, the loss of comfort, society, affection, love, companionship, solace, moral support assistance, conjugal fellowship and other damages.

77. Plaintiffs were at all times relevant hereto husband and wife.

WHEREFORE, Plaintiff, Jeanne Glynn, demands compensatory damages, plus interests and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants on each of the above referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiffs for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Mr. Glynn, health care costs, medical monitoring, together with the interest and costs as provided by the law;

2. Awarding Plaintiffs' attorney's fees and costs and treble damages;

3. Pre- and post-judgment interest; and

4. Such other and further relief as this Court deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all counts and as to all issues.

Dated: October 22, 2015

> Respectfully submitted,
>
> /s/ Marilyn T. McGoldrick, Esq.
> MARILYN T. MCGOLDRICK, ESQUIRE
> THORNTON LAW FIRM LLP
> 100 Summer Street, 30th Floor
> Boston, MA  02110
> (617) 720-1333
> (617)720-2445 (fax)
> mmcgoldrick@tenlaw.com